# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **FRIENDS OF ANIMALS, INC. AND** | : | |
| **LISA ZALASKI,** | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO.** |
| | : | **3:06-cv-1708 (VLB)** |
| **CITY OF BRIDGEPORT AND** | : | |
| **JAMES J. HONIS** | : | |
| **Defendants.** | : | **June 27, 2011** |

### MEMORANDUM OF DECISION AFTER REMAND
### FROM THE SECOND CIRCUIT COURT OF APPEALS

#### I. INTRODUCTION

The complaint in this action was filed on October 27, 2006. The plaintiff, Lisa Zalaski ("Zalaski"),[1] names as defendants the City of Bridgeport Police Department ("the City") and its Deputy Chief of Police, James J. Honis ("Honis"), in his official and individual capacities (collectively, "the Defendants"). Zalaski alleges, pursuant to 42 U.S.C. § 1983, that the Defendants violated her right to freedom of speech and assembly under the First Amendment. Zalaski's claims arise from her participation in protest demonstrations in support of animal rights taking place at the plaza outside of the Arena at Harbor Yard ("the Arena"), an approximately 10,000 seat performance venue owned by the City, prior to performances of the Ringling Brothers and Barnum and Baily Circus ("the

---

[1] Zalaski's co-plaintiff, Friends of Animals, Inc. (the "Friends of Animals"), filed a stipulation of voluntary dismissal pursuant to Rule 41(a)(1) of the Federal Rules of Civil Procedure on February 15, 2008. [Doc. #79].

Circus").  Zalaski seeks declaratory and injunctive relief as well as compensatory damages.

On the day the complaint was filed, after holding a hearing, United States District Judge Janet C. Hall granted a temporary restraining order restraining the Defendants from prohibiting Zalaski's exercise of First Amendment rights at the Circus event scheduled for later that day.  [Doc. #8].  Three months later, on January 23, 2007, Judge Hall denied the City's motion to dismiss the complaint for failure to name a necessary party.  [Doc. #20].  Thereafter, the case was transferred to the undersigned.  In anticipation of additional performances by the Circus at the Arena in October 2007, Zalaski sought a renewal of the temporary restraining order entered by Judge Hall.  Specifically, Zalaski sought an order restraining the Defendants from prohibiting demonstrations closer than 80 feet from the two main entrances to the Arena.  The Court denied Zalaski's motion, holding that the plaza outside the Arena was not a "traditional public forum" which would require the highest level of scrutiny of any government restriction of First Amendment activity taking place therein.  [Doc. #66].  The Court assumed *arguendo* that the plaza was a "limited public forum," and held that the City's 80-foot restriction was a permissible restriction upon Zalaski's First Amendment activity because it was content-neutral, served a significant government interest, and left an ample alternative channel of communication available to Zalaski.  *Id.* However, the Court reserved final determination of whether the plaza constituted a limited public forum until the filing of dispositive motions.  *Id.*

On December 11, 2007, the Defendants filed a motion for summary judgment. [Doc. #71]. On June 20, 2008, the Court granted the Defendants' motion, holding, consistent with the earlier decision on Zalaski's motion for a temporary restraining order, that the 80-foot restriction was a permissible restriction on her First Amendment activity. [Doc. #84]. The Court noted that Zalaski had failed to present any evidence in opposition to summary judgment that the plaza could be a traditional public forum.

Zalaski appealed the Court's entry of summary judgment for the Defendants. On July 27, 2010, the United States Court of Appeals for the Second Circuit issued a split decision vacating and remanding the summary judgment ruling. *Zalaski v. City of Bridgeport Police Dept.*, 613 F.3d 336 (2d Cir. 2010). The majority held that this Court had not sufficiently explained its reasoning for concluding that the plaza is a limited public forum rather than a traditional public forum, and therefore remanded with the instruction to "undertake a comprehensive forum analysis[.]" *Id.* at 343. Judge Wesley dissented, expressing the view that the grant of summary judgment to the Defendants was proper because there was no evidence in the record to support Zalaski's claim that the plaza is a traditional public forum. *Id.* at 343-45. For the reasons set forth below, the Court reaffirms its earlier decision entering summary judgment for the Defendants.

## II. FACTUAL BACKGROUND

This case arises from a protest that took place on October 25, 2006 in an entertainment complex in Bridgeport, Connecticut that includes a ballpark known as Harbor Yard, an entertainment arena known as the Arena at Harbor Yard, and a parking garage for patrons. The complex is owned by the City of Bridgeport and managed by Centerplate, a private organization, pursuant to the terms of an Operating Agreement. The Arena is a 10,000 seat multipurpose performance facility used for sporting events, shows, concerts, and other events. *See* Operating Agreement, Recitals ¶ D (describing the purpose of the complex as creating a venue for "major national sporting and musical, cultural, family and community events" which "will be an important factor in the continued encouragement, promotion, attraction, stimulation, development, growth and expansion of business, commerce and tourism within the City").

There is a large, semi-circular paved area in front of the Arena known as "the plaza." The plaza area was included in the facility design to provide patrons safe and efficient access to the Arena entrances, the will call window, and the ticket sales offices. Def. 56(a)(1) Statement ¶¶ 6-7. According to the Defendants, it is not a public thoroughfare and is under the exclusive control of Centerplate. *Id.* ¶¶ 11-12. The plaza is bordered by a grassy area, then a semi-circular private driveway for patrons to drop off passengers. *Id.* ¶¶ 6-7. The drive is bordered by a landscaped area that demarcates the end of the Arena property, which is adjacent to the public sidewalk. *Id.* The complex is surrounded by on all sides by

public streets or Metro North Railroad tracks.  Groups leasing the Arena for a performance have a contractual right to use the plaza area to promote the event and sell goods, and they frequently use the area for such purposes by setting up booths or displays.  *Id.* ¶¶ 8-10.

Under the Operating Agreement, Centerplate has "the exclusive right to manage and operate the Facility[.]"  Operating Agreement, Recitals ¶ B.  The City's only responsibility in regard to events held at the Arena is shared security and traffic control pursuant to the State of Connecticut's responsibility to ensure public safety as required by Connecticut General Statutes Section 7-148.  *Id.* Article IV, Section 4.8.  The Operating Agreement states that "the City shall take all necessary action to determine the police, security and on-site and off-site traffic control benefits necessary for safe operation of the Facility."  *Id.*  Section 4.8.1.  The agreement further provides that the City "shall be solely responsible for parking control pursuant to Section 18.14 herein and shall provide all measures as are reasonably necessary to manage crowds and direct patrons to and from Events at the Facility."  *Id.* Section 4.8.1.  In addition, the agreement provides that:

> The number of officers provided at Events shall be adequate, in the Operator's reasonable judgment, for the security of those persons attending the particular Event and the provision of security for the Facility and its contents.   When it is necessary or appropriate, in the reasonable judgment of the Operator, the Operator or its designated security representative shall consult with the Chief of Police of the City or the Chief's designee to determine the adequacy of intended security for Events at the Facility.

*Id.* Section 4.8.3.

In order to satisfy the contractual duties enunciated in the Operating Agreement, Arena personnel regularly meet with members of the Bridgeport Police Department to assess the security measures needed for events to be performed at the Arena. Def. 56(a)(1) Statement ¶ 16. The specific security measures employed vary depending primarily upon the anticipated attendance for a given event. *Id.* Since 2002, management at the Arena has set up barricades in the plaza area at varying distances depending upon the number of patrons attending an event. *Id.* ¶¶ 17-18. The purpose of the barricades is to allow an area for patrons to assemble and be screened for security purposes by Arena personnel before entering the Arena. *Id.* ¶¶ 20-25. Individuals who do not have tickets for an event are excluded from the area inside the barricades. *Id.* The Defendants explain that Centerplate began screening patrons for security purposes before entering the Arena following the World Trade Center tragedy of September 11, 2001, which heightened security concerns at large events. *Id.* ¶ 15. The barricades were set up at Arena events as a means of crowd management, to keep people a safe distance away from the security screening area, and to ensure that only ticket holding patrons who had been screened were entering the Arena. *Id.*

Since the Arena opened in 2001, Zalaski and other individuals have held demonstrations on Arena property. Compl. ¶ 1. These demonstrations occurred at times during which the Circus was holding performances at the Arena. *Id.* The purpose of the demonstrations was to express opposition to the use and

6

confinement of animals, including elephants, by the Circus. *Id.* During the demonstrations, Zalaski and other protestors "sought to engage patrons of these performances in civil discussion in order to dissuade them from further attendance and support of these performances until the use and confinement of non-human animals by the Circus ceased." *Id.* Specifically, the protestors "engaged in symbolic speech, distributed handbills, held signs, and engaged patrons in dialogue in order to communicate [their] opposition to the exploitation of non-human animals by the Circus." Zalaski Aff. ¶ 7.

Prior to their demonstrations at the Arena, the protestors provided notice to the City Police Department and City Attorney of their intent to demonstrate, and applied for and received a "special event permit" to do so. Compl. ¶ 2. During their initial demonstration in 2001, after showing their permit to police officers, Zalaski's group of protestors were allowed unfettered access to all areas outside the Arena to conduct their activities. Zalaski Aff. ¶¶ 6-8. Zalaski and other protestors continued to hold demonstrations protesting the Circus in subsequent years. At some events, they were required to stand behind barricades. Zalaski alleges that all of these past demonstrations were peaceful and orderly, and none resulted in arrest, infractions, or imposition of any criminal charges. Compl. ¶ 3.

On October 10, 2006, the Friends of Animals, a group in which Zalaski was a member, applied for a permit to hold a demonstration at the Circus' performances scheduled for October 25 through 29, 2006. *Id.* ¶ 5. The permit was

granted on October 24, 2006. *Id.* Zalaski claims that she and other demonstrators "intended, through the use of oral communication, leafletting, signs and placards, to express their opposition to" the removal of "non-human animals, including elephants, from the wild, denying them the ability to engage in normal activities and social interactions, confining them and maintaining them in captivity, all of the purpose of providing 'entertainment'." *Id.* ¶ 6. She also claims that protestors planned to wear "sad clown" costumes, which are "costumes which portray a solemn likeness of a clown shedding a single small tear." *Id.*

Consistent with their past practice and with the Operating Agreement, Arena personnel met with representatives of the Bridgeport Police Department before the Circus events scheduled to begin on October 25, 2006 in order to determine the appropriate security measures to take with respect to this event. Def. Exh. B, Tyliszczak Aff.; Def. Exh. H, McCarthy Tr., at 6; Def. Exh. K, Police Report. As a result of the security meeting, Arena personnel determined that security for the Circus event required them to set up wooden sawhorses on the plaza to form chutes in which patrons would line up to pass through a security checkpoint and enter the Arena. *Id.* Sawhorses were also placed between the entrance of each chute in a semi-circular arc mirroring the front of the Arena. *Id.* The arc, and thus the entrances to each patron line, were approximately 80 to 100 feet away from the Arena entrance. *Id.* Security personnel were placed at the entrance of each chute to check tickets and ensure that only patrons with tickets were entering the lines. *Id.* Persons who did not hold tickets to the event were

8

required to stand outside the area demarcated by the wooden sawhorses. As with many events, Bridgeport police officers were present at the Circus event to provide assistance with security if necessary. *Id.*

The animal rights protestors began arriving at the Arena to organize and participate in the demonstration at approximately 6:00 p.m. on October 25, 2006. Compl. ¶ 8. The protestors obtained various placards, banners, signs and leaflets, walked past the barricades that had been set up, and arranged themselves in a line approximately 30 to 40 feet from the entrance to the Arena, which Zalaski claims was farther from the Arena entrance than protestors had arranged themselves in previous similar demonstrations. *Id.* At some point, the protestors were approached by Honis and other police officers employed by the City and were ordered to leave the area and move to a position outside of the barricades. *Id.* ¶ 9. According to Zalaski, no explanation was given as to why they could not remain in the area. *Id.* Zalaski's counsel attempted to inform Honis that the group had obtained a permit for their demonstration, but Honis allegedly replied that he did "not care" and placed Zalaski's counsel under arrest. *Id.* ¶ 10.

Police officers then forced the protestors to move to an area approximately 80 to 100 feet from the entrance of the Arena. The Defendants claim that, in this location, the protestors had direct access with patrons who were crossing the barricades to enter the screening area designated for ticket holders and get in line for the Arena, and that no restrictions were placed on the ability of the

9

protestors to speak with patrons, distribute written literature, use placards and signs, or play videotapes of circus animals. Def. 56(a)(1) Statement ¶ 24; Def. Exh. F, Meszaros Aff.; Def. Exh. EE, Honis Dep. at 147-48, 243. Zalaski contends, however, that from this distance the protestors "could not engage patrons in normal conversation, distribute literature, have their signs read, nor use their 'sad clown' costumes to communicate to Circus patrons." Compl. ¶ 11. Shortly thereafter, a number of protestors were arrested and charged with breach of the peace, interfering with police officers, criminal trespass, and inciting to riot. The Defendants claim that the protestors were arrested because they refused to move outside the area within the barricades designated for ticket holders when asked by police officers and created a disturbance. Def. 56(a)(1) Statement ¶ 39. The charges were ultimately resolved by guilty pleas and the imposition upon each protestor of a $35 fine, plus costs. Def. 56(a)(1) Statement ¶ 41. According to Zalaski, she was not arrested because she, along with three other demonstrators, purchased a ticket to see the Circus and was thereafter allowed to enter the barricaded area and demonstrate "within five feet of the patrons being wanded and within a few feet of the front of the building for approximately an hour[.]" Zalaski Aff. ¶ 19.

Zalaski contends that, during similar Circus events in previous years, the City has allowed various groups whose messages and viewpoints were not critical of the Circus to engage in advocacy and solicit donations within a barricaded area close to the Arena entrance, within the area from which animal

rights protestors were excluded. Zalaski Aff. ¶ 26. Specifically, she claims that representatives of the Barnum Museum were permitted to set up a table inside the area that the animal rights protestors were excluded from, where they distributed literature and solicited donations for the museum. *Id.* At another Circus event, according to Zalaski, a van associated with an animal shelter was parked in an area controlled by the Arena and individuals from the shelter stood on the inner sidewalk of the Arena and distributed literature regarding dog and cat adoptions. *Id.* ¶ 28. She further claims that, at a subsequent "Bull Riding Rodeo" event at the Arena, demonstrators were allowed to stand with signs less than 20 feet from the main entrance, and that she witnessed other events held at the arena where no barricades were present. *Id.* ¶¶ 20, 23-24.

### III. STANDARD OF REVIEW

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court "construe[s] the evidence in the light most favorable to the non-moving party and . . . draw[s] all reasonable inferences in its favor." *Huminski v. Corsones*, 396 F.3d 53, 69-70 (2d Cir. 2004). "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315 (2d Cir. 2006) (internal quotation marks omitted). "The moving party bears the burden of showing that he or she is entitled to summary judgment."

*Huminski*, 396 F.3d at 69. "[T]he burden on the moving party may be discharged by 'showing'—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002). "If the party moving for summary judgment demonstrates the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor." *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir. 2002).

## IV. DISCUSSION

"Under the prevailing constitutional framework, speech restrictions imposed by the government on property that it owns are analyzed under a "'forum based' approach." *Hotel Employees & Restaurant Union v. City of New York Dept. of Parks and Recreation*, 311 F.3d 534, 544 (2d Cir. 2002). "As a general matter, the government is permitted to exercise control over the public's use of government-owned property for expressive purposes, and the degree of control permitted depends upon the nature of the property and the speech restrictions imposed thereon." *Id.*

The first category of government-owned property is the "traditional" public forum, which is defined as a forum that has "traditionally been available for public expression" and has as "a principal purpose . . . the free exchange of ideas." *Id.* Examples of public fora are streets, sidewalks, and parks. *Id.* Content-based restrictions on speech in such fora are subject to "strict scrutiny,"

meaning that they "must serve a compelling government interest and be narrowly tailored to achieve that interest." *Id.* at 545. The government, may, however, impose content-neutral time, place and manner restrictions on speech in a traditional public forum as long as those restrictions are "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communications." *Id.* (citation omitted).

The second category of government-owned property is the "designated" public forum, which is "a non-public forum that the government has opened for all types of expressive activity." *Id.* As with traditional public fora, restrictions on speech in designated public fora are constitutional only if they are "content-neutral time, place, and manner restrictions that are (1) necessary to serve a compelling state interest and (2) narrowly drawn to achieve that interest." *Id.* (internal quotation marks omitted).

The "limited" public forum is a subset of the designated public forum which exists "where the government opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects." *Id.* "In limited public fora, strict scrutiny is accorded only to restrictions on speech that fall within the designated category for which the forum has been opened." *Id.* "Thus, in a limited public forum, government is free to impose a blanket exclusion on certain types of speech, but once it allows expressive activities of a certain genre, it may not selectively deny access for other activities of that genre." *Id.* at 545-46. If expressive activity does not fall

within the limited category for which the forum has been opened, "restrictions need only be viewpoint neutral and reasonable." *Id.* at 546.

The third category of government-owned property consists of "property that the government has not opened for expressive activity by members of the public." *Id.* "The government may restrict speech in non-public fora subject only to the requirements of reasonableness and viewpoint neutrality." *Id.* Examples of non-public fora are airport terminals, military bases and restricted access military stores, jailhouse grounds, and the Meadowland Sports Complex. *Id.*

The Second Circuit has instructed that a variety of factors are to be examined in conducting forum analysis, including "the forum's physical characteristics and the context of the property's use, including its location and purpose." *Id.* at 547. Another relevant factor is "the government's intent in constructing the space and its need for controlling expressive activities on the property, as evidenced by its policies or regulations." *Zalaski*, 613 F.3d at 342 (citing *Paulsen v. County of Nassau*, 925 F.2d 65, 69 (2d Cir. 1991)). Finally, a court should consider whether the property in question "is part of a class of property which by history or tradition has been open and used for expressive activity." *Hotel Employees*, 311 F.3d at 547.

In remanding this case, the Second Circuit instructed this Court to consider leading precedents on forum analysis in cases involving performance venues, including *Hotel Employees v. City of New York Department of Parks* and *Recreation* and *Paulsen v. County of Nassau*.

In *Paulsen*, the Second Circuit considered restrictions upon the distribution of leaflets outside of Nassau Coliseum, "an enclosed elliptical structure with a capacity of 18,000 seats, [which] is surrounded by a network of sidewalks, pedestrian thoroughfares and numerous parking lots which can accommodate several thousand automobiles." 925 F.2d at 67. The Second Circuit held that the property at issue constituted a traditional public forum because the Coliseum compound had historically been used for expressive activities, could "comfortably accommodate a wide variety of expressive activities at the same time" and was "frequently the site of boisterous recreational activity." *Id.* at 70. The *Paulsen* court also noted that "[i]n many cities and suburban environs . . . , the municipal stadium has replaced the town meeting hall and the public square as a gathering place for large segments of the population to engage in meaningful discourse." *Id.* at 71.

By comparison, in *Hotel Employees*, the Second Circuit considered whether expressive in the Plaza at Lincoln Center in New York City could be limited "to events having an artistic or performance-related component, resulting in a prohibition on political rallies, demonstrations, and leafletting." 311 F.3d at 539. The Second Circuit held that the Plaza was a limited public forum because, in constructing the Lincoln Center, the City "establish[ed] a cultural center devoted to performing arts," and thereby "evidenced an intent to conserve the Plaza's function as an extension of the performing arts complex." *Id.* at 551. The Second Circuit concluded that the limitation on expressive activities in the Plaza

was proper because "plazas that serve as forecourts in performing arts complexes are not the types of public spaces that have traditionally been dedicated to expressive uses." *Id.*; *see also Int'l Soc'y for Krishna Consciousness, Inc. v. New Jersey Sports and Exposition Authority*, 691 F.2d 155, 161 (3rd Cir. 1982) (holding that the Meadowland Sports Center is not a public forum because it is a "commercial venture by the state . . . designed to bring economic benefits to northern New Jersey" and was not intended to serve "as a place for the exchange of views").

After considering the record of this case in light of these precedents, the Court holds that there is insufficient evidence to support Zalaski's position that the plaza is a traditional public forum in which restrictions upon expressive activity are subject to strict scrutiny. The evidence indicates that the plaza was intended to be and is used primarily by patrons for the purpose of entering and exiting the Arena before and after performances held inside. The plaza also allows people to access the Arena's will call window and ticket sales office. While members of the public are able to enter the plaza from public streets and sidewalks, this fact alone does not render the plaza a traditional public forum as Zalaski contends. Instead, as the Second Circuit explained in *Hotel Employees*:

> [T]he Plaza's location indicates that its primary architectural function is to serve as the centerpiece for the Lincoln Center performing arts complex . . . . Thus, although Lincoln Center was designed to be related to the city, rather than isolated from it, and the Plaza itself was designed to be open to Columbus Avenue, the Plaza's physical location distinguishes it from a typical recreational park or town square. Similarly, although the Plaza connects with walkways leading to surrounding streets, it does not form part of the City's transportation

16

grid in the way that traditional streets and sidewalks do. The ability of pedestrians to cross the Plaza as a short-cut between surrounding streets is merely an incidental feature of its principal functions as the entrance plaza for the Lincoln Center complex. Moreover, as a result of the Plaza's physical location at the center of the surrounding performance arts buildings, pedestrians visiting the Plaza likely understand that they have entered some special type of enclave.

311 F.3d at 550.

Likewise, in this case, the location of the plaza indicates that it was designed to serve as an entrance plaza to the Arena. In order to approach the Arena, one must leave the public sidewalk and cross a landscaped area and a private driveway. Based upon the physical location of the plaza directly in front of the Arena and separated from public streets and sidewalks by landscaping, a grassy area, and a private driveway, it would be clear to pedestrians visiting the plaza that they have entered into property intended for use by patrons attending Arena performances. Unlike the Nassau Coliseum grounds at issue in *Paulsen*, there is no evidence in this case to suggest that the plaza is commonly a site of "boisterous recreational activity" or serves "as a gathering place for large segments of the population to engage in meaningful discourse." *Paulsen*, 925 F.2d at 70-71. Instead, the evidence indicates that people ordinarily would not visit the plaza unless they intend to enter the Arena to view a performance inside.

Furthermore, the City clearly has a need to control expressive activities in the plaza, a forecourt which serves as the security screening area and entranceway for large crowds of patrons attending performances at the Arena. *See Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 650-51

(1981) (recognizing that the State has a substantial interest in protecting the "safety and convenience" of the patrons of large events held on public property). The City's responsibility to ensure public safety is codified in Connecticut General Statutes Section 7-148 and incorporated into the Operating Agreement, which requires the City to "provide all measures as are reasonably necessary to manage crowds and direct patrons to and from Events at the Facility." Operating Agreement Section 4.8.1. The City has routinely fulfilled its contractual duties by regularly meeting with Arena personnel to assess security measures needed for events to be performed at the Arena and, if necessary based upon the anticipated attendance for a given event and other factors, setting up barricades in the plaza to control crowd movement and allow for space to conduct security screening.

Finally, the plaza is not "part of a class of property which by history or tradition has been open and used for expressive activity." *Hotel Employees*, 311 F.3d at 547. Instead, as the Second Circuit observed in *Hotel Employees*, "plazas that serve as forecourts in performing arts complexes are not the types of public spaces that have traditionally been dedicated to expressive uses." *Id.* at 551. Thus, all of the relevant factors identified by the Second Circuit in *Hotel Employees* indicate that the plaza is not a traditional public forum.

The Court must determine, therefore, which of the remaining categories of fora the plaza falls into. Zalaski has presented no evidence that the plaza constitutes a designated public forum, which is "a non-public forum that the government has opened for all types of expressive activity." *Hotel Employees*,

311 F.3d at 545. Thus, the plaza can be classified only as a nonpublic or a limited public forum.

A limited public forum is created when the government "'makes its property generally available to a certain class of speakers,' as opposed to reserving eligibility to select individuals who must first obtain permission to gain access." *Id.* (quoting *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 679 (1998)). In other words, "[a] [limit]ed public forum is not created when the government allows selective access for individual speakers rather than general access for a class of speakers." *Forbes*, 523 U.S. at 679. In this case, the record reflects that the Arena was intended to be used to host "sporting and musical, cultural, family and community events" booked by Centerplate pursuant to the Operating Agreement. There is no indication that the Arena or the plaza area is generally available to the public to hold their own sporting events, concerts, or other functions without permission. Moreover, while the City has allowed animal rights protestors to demonstrate in the plaza since the Arena opened in 2001, the protestors were required to obtain a "special event permit" in advance of their demonstrations, including the demonstration giving rise to this lawsuit. Police officers required the protestors to show their permit before they were allowed to continue their demonstration. The fact that the protestors had to obtain a permit before being allowed to demonstrate in the plaza establishes that the City did not make the plaza "generally available" to protestors. Rather, the City reserved the right to select individuals who must first obtain permission to gain access to the

plaza for protest activities.  Therefore, even if the plaza has been opened to the public for certain purposes, it is clear that protest activities are outside the class of expressive activities for which it has been opened.  As the Second Circuit has explained, "government restrictions on expressive uses not falling within the limited category for which a limited public forum has been opened are subject to the same level of scrutiny as restrictions in non-public fora."  *Hotel Employees*, 311 F.3d at 553.

Accordingly, the Court holds that restrictions on protest activities in the plaza must merely be reasonable and viewpoint neutral.  *Hotel Employees*, 311 F.3d at 546.  The 80-foot barricades at issue in this case easily meet this standard. Zalaski has provided no evidence to support her contention that the restriction imposed by the City was based upon the content of her speech, and the evidence in the record indicates that the geographical restriction enforced against the protestors was predicated upon legitimate security concerns.

First, the 80-foot restriction was content-neutral.  The evidence in the record indicates that it was applied to all persons who did not hold tickets for the Circus, not just to the protestors.  In fact, by her own admission Zalaski and three other protestors who purchased tickets were allowed enter the barricaded area and demonstrate within a few feet of the building, which indicates that the restriction was based upon legitimate security concerns rather than the content of Zalaski's speech.

In opposition to summary judgment, Zalaski submits her own affidavit as

well as the affidavits of fellow protestors William Manetti and Nancy Rice referencing other Arena events at which either no barricades were assembled or protestors were permitted to stand behind barricades placed closer to the Arena entrance. Specifically, she references a "Bull Riding Rodeo" event at which protestors were permitted to stand with signs less than 20 feet from the Arena entrance. Zalaski Aff. ¶ 20. She also references three other events - a concert of the Boston Symphony Orchestra, "Disney's High School Musical," and "The Home Show" - at which she claims no barricades were set up in the Arena plaza and members of the public were able to approach the front of the Arena without obstruction. *Id.* ¶¶ 22-24. However, this evidence does not support her position that the 80-foot restriction enforced at the Circus event on October 25, 2006 was content-based. The Defendants have presented evidence that the Bridgeport Police and Arena personnel determined whether to place barricades, and if so at what distance from the Arena entrance to place them, on an event-to-event basis depending upon security concerns. The affidavits submitted by Zalaski contain no information whatsoever comparing these other events to the Circus in terms of crowd size or in any other respect. In the absence of such information, there is nothing to rebut the Defendants' assertion that the barricades were placed where they were at the Circus event due to legitimate security needs as assessed by Arena personnel in consultation with the Bridgeport police.

Next, Zalaski's affidavit alleges that at previous Circus events, the City permitted the Barnum Museum to maintain tables inside the barricaded area of

the Plaza from which they distributed literature and solicited donations.  Zalaski Aff. ¶ 26.  However, the fact that Arena personnel permitted groups associated with the Circus to set up tables to promote the Circus during Circus events does not suggest viewpoint bias on the part of the City; indeed, as a lessee of the Arena the Circus had a contractual right to use the plaza area for promotional purposes during its events.  Zalaski also states that at one Circus event individuals associated with an animal shelter were permitted to stand on the inner sidewalk of the Arena and distribute literature.  *Id.* ¶ 18.  However, she fails to provide sufficient information regarding this event from which the Court could draw an inference of viewpoint bias by the City.  For example, she does not indicate the date of the Circus event, whether the individuals associated with the animal shelter had purchased tickets to the Circus, whether barricades were in place at this particular event, or where her group of demonstrators was required to stand in comparison to the individuals from the animal shelter.

Finally, Zalaski claims that when protesting Circus events in prior year, she and other protestors where permitted to stand closer to the Arena entrance then they were on October 25, 2006.  However, this fact does not evidence viewpoint bias on the part of the City; instead, it supports the Defendants' claim that the City and Arena personnel determined where to place barricades at each particular event based upon legitimate security considerations.  In sum, Zalaski has presented no evidence aside from conclusory, self-serving affidavits to support her claim that the City was biased against her viewpoint.  Therefore, she has

failed to raise a genuine issue of material fact for trial.  *See Ramsey v. Goord*, 661 F. Supp. 2d 370, 384 (W.D.N.Y. 2009) ("Vague assertions supported only by self-serving statements in the nonmoving party's affidavit are insufficient to defeat a properly supported summary judgment motion.") (citing *Coniglio v. High Services, Inc.*, 495 F.2d 1286, 1292 (2d Cir. 1974)); *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) ("The non-moving party may not rely on conclusory assertions or unsubstantiated speculation to defeat summary judgment.").

Similarly, there is no evidence that the 80-foot geographical restriction enforced against the animal rights protestors was unreasonable.  As noted previously, the City clearly has an interest in ensuring security and maintaining orderly crowd movement at large events like the Circus.  Prior to the Circus events scheduled to begin on October 25, 2006, representatives of the Bridgeport Police Department met with Arena personnel to discuss appropriate security measures.  They determined, based upon the size of the event, that security concerns required them to set up wooden sawhorses on the plaza to form chutes in which patrons would line up to pass through a security checkpoint and enter the Arena.  Sawhorses were also placed between the entrance of each chute in a semi-circular arc mirroring the front of the Arena.  The arc, and thus the entrances to each patron line, were approximately 80 to 100 feet away from the entrance of the Arena.  Security personnel were placed at the entrance of each chute to check tickets and ensure that only patrons with tickets were entering the lines.  Persons who did not hold tickets to the event were required to stand

outside the area demarcated by the wooden sawhorses. Zalaski and three other protestors who had purchased tickets to the event were allowed to enter the lines, while the remaining protestors who did not hold tickets were required to stand outside the barricades. Thus, the evidence in the record establishes that the geographical restriction enforced against the protestors was not an arbitrary one; rather, it was related to legitimate security concerns at the Arena.

Zalaski's suggestion that the barriers could have been placed closer to the Arena entrance does not create a disputed issue of material fact. As the Supreme Court explained in the context of addressing a state statute prohibiting solicitation of votes and displays or distribution of campaign materials within 100 feet of the entrance to a polling place, "we simply do not view the question whether the 100-foot boundary line could be somewhat tighter as a question of constitutional dimension. Reducing the boundary line to 25 feet . . . is a difference only in degree, not a less restrictive alternative in kind." *Burson v. Freeman*, 504 U.S. 191, 210 (1992) (internal citations and quotation marks omitted). Although the *Burson* Court recognized that at some distance governmental regulation could effectively become an impermissible burden on expressive activities, there is no evidence that such a burden was imposed in this case. To the contrary, as the Court found in its earlier decision denying Zalaski's motion for a temporary restraining order and preliminary injunction and as supported by the evidence submitted by the Defendants on summary judgment, the protestors were able to effectively communicate with Circus patrons from

behind the barricades. For instance, the protestors were able to speak to and hand out leaflets at the openings to the barricades where patrons entered to line up for security screening. From their position, the protestors and their placards could also be seen and their voices could be heard by patrons inside the barricaded area who were heading into the Arena. Zalaski has failed to present any countervailing evidence in opposition to summary judgment.

Even assuming, moreover, that the plaza is a limited public forum that has been opened to protestors, the result would not change because the Court holds that the City's restriction satisfies strict scrutiny. In limited public fora that have been opened for a designated activity, content-neutral restrictions on speech falling within that designated category "must be narrowly tailored to serve a significant government interest, and must leave open ample alternative channels of communication." *Zalaski*, 613 F.3d at 341 (internal quotation marks omitted). As already discussed, the geographical restriction imposed by the City was narrowly tailored to serve the City's significant interests in security and crowd control at a large event. Further, the restriction left open ample alternative channels of communication for the protestors. The protestors and their placards could be seen and their voices could be heard by patrons entering the Arena from their position behind the barricades, and they could also distribute leaflets and speak to patrons as they approached the openings to the barricades to line up for security screening.

### V. CONCLUSION

Based upon the above reasoning, the Court holds that the Defendants are entitled to summary judgment. The Clerk is directed to enter judgment for the Defendants, and to close this case.

IT IS SO ORDERED.

_____/s/_____

Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: June 27, 2011.